# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | NO. 3:09cr117 (MRK) |
| | : | |
| EUGENE ARGRAVES | : | |

## RULING AND ORDER

On May 20, 2009, Defendant Eugene Argraves was indicted on one count of a twenty-three

count Indictment filed against thirty-three individuals on the basis of their alleged involvement in

federal narcotics trafficking violations.  In particular, Mr. Argraves was charged with conspiracy

with intent to distribute, and to distribute, five kilograms or more of cocaine, in violation of 21

U.S.C. §§ 846 and 841(b)(1)(A)(ii).  After his arrest on May 27, 2009, the Government moved to

have Mr. Argraves detained pending trial.  Magistrate Judge Thomas Smith conducted a detention

hearing on June 4, 2009, at the conclusion of which he ordered Mr. Argraves detained on the basis

of his danger to the community.

Currently pending before the Court is Mr. Argraves's Motion for Revocation or Amendment

of Detention Order [doc. # 236].  Mr. Argraves seeks this Court's *de novo* review under 18 U.S.C.

§ 3145(b) of Magistrate Judge Smith's Order of Detention.  He challenges Magistrate Judge Smith's

finding that the Government demonstrated by clear and convincing evidence that he should remain

detained pending trial because of his dangerousness.  Specifically, Mr. Argraves seeks review of

Magistrate Judge Smith's conclusion that "an individual who deals cocaine with this frequency and

in this quantity, is plainly, manifestly a danger, not just to the fabric of society, but to families and

to communities, and to the state, and to the country as a whole."  *See* Memorandum in Support of

Motion to Review Detention Order [doc. # 328] Ex. 1 (Transcript of Detention Hearing dated June

4, 2009) at 20.

In deciding Mr. Argraves's Motion for Revocation or Amendment of Detention Order [doc. # 236], this Court must determine *de novo* (1) whether the Government has shown by clear and convincing evidence that Mr. Argraves is a danger to the community within the meaning of the Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.*, and (2) whether any combination of the conditions of release set forth under 18 U.S.C. § 3142(c) can reasonably assure the safety of the community. *See United States v. Dillard*, 214 F.3d 88, 91 (2d Cir. 2000) (citing 18 U.S.C. § 3142(e)).  For the reasons that follow, the Court denies Mr. Argraves's Motion for Revocation or Amendment of Detention Order [doc. # 236] without prejudice to his right to reapply for pretrial release or to seek additional conditions to ameliorate the risks and concerns expressed by the Court.

## I.

The Eighth Amendment to the United States Constitution states that "[e]xcessive bail shall not be required."  U.S. Const. amend. VIII.  In accordance with this mandate, The Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.* (hereinafter the Act), requires a defendant's release pending trial "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community."  18 U.S.C. § 3142(b); *see also United States v. Sabhnani*, 493 F.3d 63, 74-75 (2d Cir. 2007).  "Because the law generally favors bail release, the [G]overnment carries a dual burden in seeking pre-trial detention." *Sabhnani*, 493 F.3d at 75.  First, the Government must show that the defendant presents a risk of flight or is dangerous to another person or the community.  If it satisfies this first requirement, the Government must then demonstrate that no condition or combination of conditions could reasonably assure the defendant's presence in court or the community's safety. *Id.*; *Dillard*,

214 F.3d at 91.

In cases concerning a defendant's risk of flight, the Government may satisfy its burden by a preponderance of the evidence. *Sabhnani*, 493 F.3d at 75. However, in view of the conditions that Mr. Argraves is willing to adhere to, the Government has never argued that he presents a risk of flight. Rather, it has proceeded solely on the basis of reasonably assuring the safety of the community. Where, as here, the Government proceeds solely on the basis of dangerousness, it must satisfy its burden by clear and convincing evidence. *See* 18 U.S.C. § 3142(f); *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995). The Second Circuit has made clear that under the Act's statutory scheme, "it is only a limited group of offenders who should be denied bail pending trial." *Sabhnani*, 493 F.3d at 75 (quotation marks omitted); *see also Dillard*, 214 F.3d at 98 (further explaining this point). This is consistent with the principal purpose of the Act, which "was to require the pretrial detention of dangerous defendants." *Dillard*, 214 F.3d at 103.

However, under the Act, cases involving certain offenses – namely, a crime of violence, an offense for which the maximum sentence is life imprisonment or death, an offense punishable by a maximum term of ten years or more under the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, the Controlled Substances Import and Export Act, 21 U.S.C. § 951 *et seq.*, or the Maritime Drug Law Enforcement Act, 46 U.S.C. App. § 1901 *et seq.*, or any felony if the person has been convicted of two or more specified prior offenses – trigger a rebuttable presumption subject to further judicial findings that no condition or combination of conditions will reasonably assure the safety of the community. *See* 18 U.S.C. § 3142(f)(1) & (e)(1)-(3). In including certain enumerated offenses in the Act, Congress appropriately balanced "the government's 'regulatory interest in community safety' with the 'individual's liberty interest.'" *Dillard*, 214 F.3d at 101 (quoting *United States v. Salerno*,

3

481 U.S. 739, 748 (1987)).  The statutory scheme also sets forth a second rebuttable presumption that a defendant is a flight risk and endangers the community where "the judicial officer finds that there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act . . . ." 18 U.S.C. § 3142(e); *see also United States v. Leon*, 766 F.2d 77, 81 (2d Cir. 1985).  In this case, Mr. Argraves has been indicted for conspiracy to distribute five kilograms or more of cocaine, which carries a mandatory minimum sentence of no less than 10 years' imprisonment.  *See* 21 U.S.C. §§ 846 & 841(b)(1)(A)(ii).  The federal grand jury's indictment of Mr. Argraves establishes the probable cause necessary to trigger the statutory presumption of dangerousness under § 3142(e).  *See United States v. Streater*, No. 3-97-CR-232(EBB), 1999 WL 1067837, at *4 (D. Conn. Nov. 5, 1999) (citing *United States v. Contreras*, 776 F.2d 51, 55 (2d Cir. 1985)); *United States v. Rodriguez*, 950 F.2d 85, 87 (2d Cir. 1991).  Mr. Argraves does not argue otherwise.

Because the statutory presumption has been triggered in this case, Mr. Argraves "must introduce some evidence contrary to the presumed fact in order to rebut the presumption." *Rodriguez*, 950 F.2d at 88.  However, Mr. Argraves has only a burden of production in response to the presumption; for the Government retains its burden of persuasion to establish by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community.  *See United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001) (citing *Rodriguez*, 950 F.2d at 88).  The Government need not introduce evidence of a defendant's prior violence or dangerous conduct to meet this burden.  *Rodriguez*, 950 F.2d at 89.  Rather, as is particularly relevant to the facts of this case, the Second Circuit has recognized that "[i]t is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of

4

'danger.'" *Leon*, 766 F.2d 77 at 81; *see also Dillard*, 214 F.3d at 95, 101-02 (discussing the rationale underlying Congress's decision to enact the Act, expand previous law to provide for detention on the basis of dangerousness, and give judges increased flexibility and authority to assess community safety in pretrial decisions).

Where a defendant proffers evidence in response to the statutory presumption under § 3142(e) that no condition or combination of conditions will reasonably assure the safety of the community, the Court weighs the statutory presumption along with the factors set forth under 18 U.S.C. § 3142(g) to determine whether the Government has shown by clear and convincing evidence that the defendant's pretrial detention is necessary. *Rodriguez*, 950 F.2d at 88. Thus, even if Mr. Argraves were to affirmatively rebut the presumption under § 3142(e), "the presumption, rather than disappearing altogether, continues to be weighed along with other factors to be considered when deciding whether to release a defendant." *Id.* Furthermore, in deciding Mr. Argraves's motion, the Court must assess whether there are conditions of release that will reasonably assure the safety of the community. In doing so, the Court "should not simply defer to the judgment of the magistrate, but [should] reach its own independent conclusion." *Leon*, 766 F.2d at 80; *see Streater*, 1999 WL 1067837, at *3 (in light of *Leon*, equating the Court's task under § 3145(b) to *de novo* review).

Under 18 U.S.C. § 3142(g), the Court must take into account the following information when determining the degree of danger to the community and whether there are conditions of release that will reasonably assure its safety:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
>
> (2) the weight of the evidence against Mr. Argraves;

(3) the history and characteristics of Mr. Argraves, including –

(A) his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by Mr. Argraves's release.

18 U.S.C. § 3142(g); *Leon*, 766 F.2d at 81 (noting that the factors are critical to determining the degree of harm to society caused by narcotics trafficking).

## II.

Mr. Argraves argues that the Government has not demonstrated by clear and convincing evidence either that he is a danger to the community or that there is a lack of conditions that will reasonably assure the community's safety if he is released pending trial. Although there are certainly facts that support Mr. Argraves's position, after considering the factors under 18 U.S.C. § 3142(g), and with due weight accorded to the statutory presumption under 18 U.S.C. § 3142(e), the Court finds that the Government has shown by clear and convincing evidence that Mr. Argraves's detention is required to reasonably assure the safety of the community. The Court reaches this conclusion in light of the substantial risk that Mr. Argraves will re-offend if released pending trial as well as the lack of available conditions that will adequately respond to the sources of that risk.

The first factor under § 3142(g) requires the Court to consider the nature of the offense

charged, including whether it involves a narcotic drug.  *See* § 3142(g)(1).  As the Court has previously stated, Mr. Argraves was charged with conspiracy to possess with intent to distribute five kilograms of cocaine, a charge that undoubtedly involves a narcotic drug.  Thus, as an initial matter, this factor weighs against his release.  Moreover, the charge falls within one of the enumerated categories under § 3142(e) for which the rebuttable presumption of dangerousness is triggered after a finding of probable cause.

As the Second Circuit recognized in *Dillard*, the Act "explicitly commands consideration of pretrial detention for numerous categories of defendants, all of whom are protected by the presumption of innocence."  *Dillard*, 214 F.3d at 102; *see also* 18 U.S.C. § 3142(j) ("Nothing in this section shall be construed as modifying or limiting the presumption of innocence.").  However, the Second Circuit also has stated that high penalty drug crimes are among "the most serious" of offenses and that, as a result, Congress limited detention eligibility to these and certain other enumerated offenses.  *See Dillard*, 214 F.3d at 101.  The legislative history of the Act sheds light on Congress's concern regarding defendants charged with major drug felonies: "'Persons charged with major drug felonies are often in the business of importing and distributing dangerous drugs, and thus, because of the nature of the criminal activity with which they are charged, they pose a significant risk of pretrial recidivism.'"  *United States v. Shea*, 749 F. Supp. 1162, 1166 (D. Mass. 1990) (quoting S. Rep. No. 225, 98th Cong., 2d Sess. 20, *reprinted in* 1984 U.S. Code Cong. & Admin. News 3182, 3203).  Accordingly, because Mr. Argraves is charged with a serious narcotics violation, the Court finds that the first factor counsels against his pretrial release.  *See Streater*, 1999 WL 1067837 at *6.

The next factor the Court considers is the weight of the Government's evidence against Mr. Argraves.  *See* § 3142(g)(2).  As is the case with most pre-trial detention proceedings, the

7

Government proceeded on proffers. *See United States v. Abuhamra*, 389 F.3d 309, 321 n.7 (2d Cir. 2004) (citing *United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000)); *see also United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986) (noting that the defendant also may proceed by proffer); § 3142(f) ("The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing.").  Here, the Government has proffered evidence of wiretap intercepts, text messages, surveillance, and other information from its investigation that links Mr. Argraves to his co-defendant Peter Maylor, whom the Government maintains also occupies a central role in this Hartford-based narcotics trafficking organization.  Based on the wire intercepts and text messages between Mr. Argraves and Mr. Maylor, as well as other information from its investigation, the Government believes that Mr. Argraves supplied Mr. Maylor and other associates with a hundred or more kilograms of cocaine over an extended period of time.  The Government's wire intercepts are further supported by information that it obtained from a Confidential Source (the "Source").  The Government deemed the Source to be accurate and reliable because of information that the Source provided that was corroborated by the Government's own contemporaneous investigation.

The Source provided a wealth of relevant information concerning Mr. Argraves's drug-related activities.  For example, the Source stated that an individual the Source knew to be "Gene" (later confirmed by the Government to be Mr. Argraves) was a multi-kilogram cocaine trafficker who was considered to be one of the largest dealers in the Greater Hartford area, that he was known to have some of the purest cocaine available, that he had mentioned making $400,000 from drug trafficking, and that he was known to be involved in supplying kilo-level quantities of cocaine for at least the ten months prior to February 2009.  The Source further stated that he/she had observed "Gene"

8

supply a kilogram brick of cocaine with a brand stamp on it.  On the basis of the Source's information, the Government believes that Mr. Argraves must have sold in excess of 100 kilograms of cocaine, and that he was most likely supplying cocaine bricks received directly from a source country.  Moreover, the Source stated that multiple kilograms of the cocaine that "Gene" supplied were hidden inside the lining of an oxygen tank that a welder opened through use of a blow torch.

In addition, the Government has proffered evidence that Mr. Argraves used his primary residence – which he shares with his fiancee and minor child – as one of the bases for his drug-trafficking operations.  On numerous occasions, the Government interpreted text messages sent between Mr. Argraves and Mr. Maylor to mean that the men were coordinating the delivery of drug proceeds to Mr. Argraves's home.  On the basis of other intercepted information and surveillance of the home, the Government believes that narcotics transactions also took place at Mr. Argraves's house. Furthermore, when the Government executed its search warrant of Mr. Argraves's home, it seized approximately 166 grams of cocaine, approximately $115,000 in cash that was hidden throughout the house's kitchen, a digital scale with cocaine residue, and an envelope that the Government believes to be a drug debt ledger reflecting drug monies owed to Mr. Argraves in excess of $245,000.  Given the nature and extent of the Government's intercepted communications, the information provided by the Source, the seemingly central role that Mr. Argraves played as a major source of kilograms of cocaine, and the evidence seized from Mr. Argraves's primary residence, the Court finds that the weight of the Government's proffered evidence against Mr. Argraves is substantial. As Magistrate Judge Smith similarly noted at Mr. Argraves's earlier detention hearing, "the government's evidence in this case is clear, it's convincing, and it's overwhelming.  The government, through its proffer, and in the indictment in this case, has portrayed this gentleman as

9

a major-league drug dealer." *See* Mem. in Supp. of Mot. to Review Detention Order [doc. # 328] Ex. 1 at 19.

The third factor the Court must consider is the "history and characteristics" of Mr. Argraves. *See* § 3142(g)(3). In doing so, that Court may take into account a number of variables: for example, Mr. Argraves's character, his family and community ties, his employment history, his criminal history, if any, and his financial resources. Here, some of these factors weigh in Mr. Argraves's favor. As Mr. Argraves emphasized in his submissions to the Court and at oral argument, he has significant ties to his family and community. He is a forty-one year-old male who has resided in Connecticut for most of his life. He is engaged to be married to his fiancee, with whom he shares his home. The couple also has a four-year-old child who resides with them. Moreover, Mr. Argraves has two adult children from a previous marriage who also live in Connecticut, one of whom is expecting her own child. Furthermore, Mr. Argraves has a disabled, adult sister who resides in the immediate vicinity of Mr. Argraves's home and for whom he provides emotional and physical support.

In addition, he finds family support in his father and stepmother, who reside locally, and in his fiancee's family, who also reside in the area. In fact, many of these family members were present at his in-court detention hearing on June 23, 2009. The Court finds it significant that these family members are not only emotionally committed, but also financially committed, to his successful pretrial release. Mr. Argraves's father, stepmother, fiancee, and fiancee's father, are each ready and willing to put up equity in their homes as collateral to secure his release. In addition, Mr. Argraves has offered a letter of support from a former co-worker who describes him as responsible, loyal, and trustworthy. This friend also notes that Mr. Argraves supported a charitable organization with which

10

his friend is closely involved.  Furthermore, Mr. Argraves has no reported mental health or substance abuse issues, and has no history of violence.

With respect to his employment, Mr. Argraves was consistently employed by American Cellular Company, LLC for the sixteen years prior to its acquisition by Verizon in 2007.  In some of these years, Mr. Argraves earned in excess of $100,000.  In addition, in recognition of his loyalty to the company, Mr. Argraves received a severance package and motor vehicle upon his departure from American Cellular.  Since 2007, Mr. Argraves has been self-employed and primarily involved in home improvement, building maintenance, and real estate.  Although he has struggled financially in recent years, he states that he is likely to secure a $15,000 construction contract should the Court order his release.  However, the fact remains that since 2007, Mr. Argraves's gainful employment has been less stable and far less profitable than his previous employment as Director of Operations with American Cellular.

In addition, Mr. Argraves cites his lack of a prior criminal record as evidence that he is unlikely to re-offend or pose a danger to the community if released.  Although Mr. Argraves concedes that he was convicted in 1991 for possession of narcotics and then again in 1993 for sale of narcotics, Mr. Argraves emphasizes that in January 2009, the State of Connecticut Board of Pardons and Paroles granted him a Certificate of Pardon as to these convictions.  *See* Mem. in Supp. of Mot. to Review Detention Order [doc. # 328] Ex. 2.  As a result, he argues that for all practical purposes, he stands before the Court with no prior criminal record.  However, the Court notes that the significance of Mr. Argraves's pardon to this Court's determination of whether he should be released is seriously undermined by the fact that Mr. Argraves received his pardon at precisely the same time that the Government was intercepting calls between him and Mr. Maylor that indicate that

11

he was a kilogram source of supply.  Furthermore, in February 2009, only one month after he received his pardon, the Source provided information to the Government that "Gene" was known to be dealing in kilogram quantities of cocaine for the previous ten months.  The Board of Pardons would not have taken the same action if it were aware of evidence that Mr. Argraves was currently acting as a central figure in an extensive drug trafficking operation.

Thus, Mr. Argraves has offered evidence of his strong family and community ties as well as his significant prospects for gainful employment.  However, some of this evidence is tempered by the fact that Mr. Argraves has been under increased financial pressures since his employment with American Cellular ended, financial pressures which coincide with his alleged involvement in a highly profitable drug trafficking operation and which may be exacerbated by the expenses of this criminal case.  Therefore, the Court finds that Mr. Argraves is under substantial financial distress at this time, and that while his family has offered to help with his expenses, the temptation to address that distress through drug-related activity is great.

Finally, the Court must consider "the nature and seriousness of the danger to any person or the community that would be posed by [Mr. Argraves's release]."  § 3142(g)(4).  This factor, which was added under the Act, reflects Congress's appreciation for "'the deep public concern . . . about the growing problem of crimes committed by persons on release'" as well as its

> recognition that "*there is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons.  It is with respect to this limited group of offenders that the courts must be given the power to deny release pending trial.*"

*Leon*, 766 F.2d at 80 (quoting S. Rep. No. 225, 98th Cong., 1st Sess. 6-7, *reprinted in* 1984 Code Cong. & Admin. News 3182, 3188-89 (emphasis added)).  Although Mr. Argraves has argued that

the Government opposes his detention merely on the weight of its evidence against him as well as his allegedly high-level involvement in the charged drug conspiracy, the Government has articulated specific concerns that relate to Mr. Argraves's likelihood to re-offend pending trial.  Thus, the Government has not taken the position that Mr. Argraves's status as a central supplier in the charged drug conspiracy by itself merits his detention; instead, it argues that the unique circumstances of this case present a substantial risk that Mr. Argraves will re-offend while on pretrial release.  According to the Government, this risk presents a danger to the community that cannot be overcome by any combination of conditions of release.

The Government points to a constellation of factors in support of its position that Mr. Argraves presents as a risk to the community.  First, it states that Mr. Argraves's sources of supply were never identified during its investigation, partially because the Government believes it accessed only his "distribution phones" and not his "supply phones."  Thus, Mr. Argraves's sources of supply remain intact.  The Government further contends that any source of supply is likely connected to a sophisticated organization given Mr. Argraves's ability to secure stamped bricks as well as an oxygen tank lined with cocaine.  In response, Mr. Argraves argues that any individual allegedly involved in the drug trade would be far less likely to transact with him given his pending criminal case.  This is especially so, he says, because he is likely to be perceived as having a significant motivation to cooperate with the Government.  That said, the Court is never willing to underestimate the resourcefulness of those involved in the drug trade, particularly those that are involved in kilogram-quantity transactions.

Additional evidence particular to this case further undermines Mr. Argraves's argument.  For example, on the basis of the Government's proffered evidence, approximately $245,000 is owed to

Mr. Argraves. Presumably, some of this money is owed to his source or multiple sources of supply. In addition, the Government has seized over $115,000 in cash from Mr. Argraves's kitchen as well as an additional $200,000 from a bank account belonging to him. The Government also seized one of his motor vehicles. As the Court has already stated, Mr. Argraves's current employment is less than stable, and he faces increased financial pressure as a result of retaining counsel in this case. Thus, the Court finds that the Government has articulated a legitimate concern that the financial pressures Mr. Argraves experienced in the past have been exacerbated, thereby creating a substantial risk that he will re-offend if released.

In addition, the Government notes that unlike some defendants, Mr. Argraves was not motivated to engage in the drug trade as a result of a drug or gambling addiction; rather, the information provided by the Source supports an inference that he was motivated by greed and profitability. As another district court has noted, "[w]hile one might suppose that a person under indictment would be on his best behavior pending trial and avoid transacting any illegal drug business, the lure of illegal profits of the size drug dealers reap may override the more sensible course." *United States v. Samuels*, 436 F. Supp. 2d 280, 286 (D. Mass. 2006). This temptation may be that much greater because Mr. Argraves has at least one intact source of supply and retains an unindicted customer base. In addition, the Government proffered evidence of wiretap intercepts in which Mr. Argraves referred to a stash location that the Government was unable to identify. And again, according to the Government's proffered evidence, Mr. Argraves is a central figure in the Greater Hartford area drug trade. That he will simply walk away from this role while under financial pressure is questionable. As Judge Keeton noted in *Shea*, "[a] person who allegedly led a criminal enterprise involving cocaine distribution fits squarely within the congressional paradigm of a

14

dangerous defendant accused of drug offenses."  749 F. Supp. at 1169.

Mr. Argraves rightfully notes that the financial pressures that the Government points to in support of its position are undermined by the fact that he is not destitute, that his fiancee is gainfully employed, and that his family members are willing to help him cover his expenses.  However, the Court finds that the combination of factors – the substantial monies owed to Mr. Argraves, the likely existence of an unknown stash location of drugs or drug proceeds, and the ready access that Mr. Argraves has to a sophisticated drug trade – substantially increases the risk that he will re-offend, and thus, endanger the community.  Thus, the Court concludes that the cumulative effect of the unique circumstances presented in this case amounts to clear and convincing evidence that Mr. Argraves poses a danger to the community.

However, the Court must still determine whether the combination of stringent conditions that Mr. Argraves proposes will assure the safety of the community despite this substantial risk.  *See Ferranti*, 66 F.3d at 542-43.  At oral argument, Mr. Argraves indicated that a number of his close family members were ready and willing to post equity in three different homes for bond if required to do so.  In addition, these family members stated that they would co-sign the bond with a full understanding of the responsibilities and obligations associated with that action.  Mr. Argraves argues that his close ties with his family members belie any notion that he will violate the conditions of his release and saddle his loved ones with onerous financial burdens.  However, the Second Circuit has stated repeatedly that conditions of release that may be sufficient to overcome a risk of flight – including, but not limited to, increased financial obligations, decreased access to liquid assets, surrender of a passport, and further travel restrictions – are often insufficient to reasonably assure the community's safety.  *See, e.g.*, *Rodriguez*, 950 F.2d at 89; *United States v. Colombo*, 777

F.2d 96, 100 (2d Cir. 1985).   In *Rodriguez*, which also involved a defendant's danger to the community, the court believed that the defendant's release under a $100,000 security bond, cosigned by four individuals, strict pretrial supervision, and travel restrictions would do little more than ensure his appearance at trial.   950 F.2d at 89.   Similarly, the court concluded in *Colombo* that the defendant's pretrial supervision, surrender of his passport, and posting of a bond would cause him inconvenience and assure his appearance at trial but do nothing to protect the community from his further criminal activity.   777 F.2d at 100; *see also Mercedes*, 254 F.3d at 437.

Mr. Argraves also represented that he will submit to electronic monitoring, a curfew between 9:00 p.m. and 7:00 a.m., and home confinement.   In addition, he is willing to submit to unannounced searches of his home by the Drug Enforcement Administration (DEA) and United States Probation Office (USPO).   The Court notes that it could impose further conditions of release, such as ordering Mr. Argraves not to acquire any mode of cellular communication.   Even assuming that the Court were to order this combination of more elaborate conditions, the Court does not believe that these conditions would respond to the unique risks articulated by the Government in this case.   For example, Mr. Argraves is self-employed and in a job that requires him to travel to various locations throughout the day.   During this time, he would be wholly unsupervised and thus, able to undertake criminal endeavors.   In addition, there is no method through which Pretrial Services can ensure that Mr. Argraves does not purchase or use a prepaid cellular phone in order to complete one or more drug transactions.   As the Second Circuit recognized in *United States v. Orena*, a case that also addressed whether a defendant's proposed conditions would reasonably assure the community's safety, "electronic surveillance systems can be circumvented by the 'wonders of science and of sophisticated electronic technology,' and . . . monitoring equipment can be rendered inoperative."

986 F.2d 628, 632 (2d Cir. 2003).

In *Orena*, the court admittedly was dealing with a high-level "crime figure" who had a substantial capacity for violence and who presented as a danger to specific individuals as well as innocent bystanders in the community. *Id.* at 631-32.  However, the court's decision principally focused on whether there were conditions of release that would respond to the specific dangers posed by the defendant's release.  Here, the Court's task, albeit under markedly different facts, is the same. Thus far, the Court finds that there is an absence of conditions to ensure that Mr. Argraves does not engage in the drug trade while on pretrial release.  Moreover, the condition that the DEA and USPO can conduct unannounced searches of his home does not respond to the proffered evidence that Mr. Argraves has an unknown stash location of drugs, drug proceeds, or both.  Thus, much like the circumstances that the Second Circuit faced in *Orena*, the Court is confronted with proposed, elaborate conditions that do little to alleviate the particular dangers to the community that would be present if Mr. Argraves were released.  *Compare Orena*, 986 F.2d at 632-33 and *Ferranti*, 66 F.3d at 544 (finding conditions would not impede the specific crimes that defendant's release endangered) *with Sabhnani*, 493 F.3d at 77-78 (finding that specifically-tailored and elaborate conditions, the costs of which were borne by defendants, reasonably mitigated any concerns regarding their risk of flight and thereby warranted release, especially given the lack of the statutory presumption in favor of detention).

Thus, at bottom, were the Court willing to release Mr. Argraves, it would have to take his word that he will not commit another crime.  Given the particular facts of this case – namely, the large periods of time that Mr. Argraves would be unsupervised throughout the day, the financial pressures that he is experiencing as a result of sporadic work and seized assets, the inability on the

part of the Government to identify his suppliers and remaining customers, the likelihood of an unknown stash location, and the large amount of money still owed to Mr. Argraves – the Court is unwilling to take Mr. Argraves's word to the possible detriment of the community. *See Rodriguez*, 950 F.2d at 89; *Colombo*, 777 F.2d at 100 ("[W]here there is a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate." (quotation marks omitted)). This is especially so given Mr. Argraves's likely assurances to the Board of Pardons that he was no longer engaged in criminal activity at precisely the point in time that the Government claims he was dealing in kilograms of cocaine.

The Court acknowledges the commitments that Mr. Argraves and his family are willing to undertake to secure his pretrial release, but there is "nothing in the Bail Reform Act that requires the government to staff home detention centers or allow dangerous defendants to be at large based upon their promise not to violate conditions of bail." *Orena*, 986 F.2d at 633. Thus, although there are certainly some facts that support Mr. Argraves, the unique facts that the Government has proffered in this case lead the Court to conclude and find that it has demonstrated by clear and convincing evidence that there is no condition or combination of conditions that will reasonably assure the safety of the community if Mr. Argraves is released pending trial. *See id.*; *see also Dillard*, 214 F.3d at 103 ("Clearly Congress in passing [the Bail Reform Act of 1984] did not believe the presumption of innocence should bar the pretrial detention of defendants who seriously threaten the safety of the community."); *Ferranti*, 66 F.3d at 544 (finding clear and convincing evidence supporting detention on the basis of dangerousness and citing further cases where conditions were insufficient to assure the community's safety).

**III.**

Thus, after considering the factors set forth under 18 U.S.C. § 3142(g) and according due weight to the presumption under 18 U.S.C. § 3142(e) that no condition or combination of conditions will reasonably assure the safety of the community if the Court ordered Mr. Argraves released, the Court DENIES the Motion for Revocation or Amendment of Detention Order [doc. # 236].  Mr. Argraves's motion is denied without prejudice to his right to reapply for pretrial release or to seek additional conditions to ameliorate the risks and concerns expressed by the Court.

IT IS SO ORDERED.

/s/      Mark R. Kravitz      
United States District Judge

Dated at New Haven, Connecticut: **June 26, 2009**.

19