## UNITED STATES DISTRICT COURT
## DISTRICT  OF  CONNECTICUT

UNITED STATES OF AMERICA        :
                                     :
v.                                          :       NO. 3:09cr117 (MRK)
                                       :
EUGENE ARGRAVES             :

### RULING AND ORDER

On May 27, 2009, police arrested Defendant Eugene Argraves in this case and searched his house in accordance with a federal arrest and search warrant.  After placing Mr. Argraves under arrest, but before beginning the search, Mr Argraves made several incriminating statements to police. At the time of the statements, the police had not yet explained to Mr. Argraves his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  Mr. Argraves now moves to suppress his statements. *See* Mot. to Suppress Statements to Law Enforcement Personnel [doc. # 501].  He does not challenge the physical evidence located during the search.  Moreover, the Government has represented to the Court and Mr. Argraves that it does not seek to offer into evidence anything other than Mr. Argraves first statement to police.  Therefore, the question before the Court is whether, as Mr. Argraves argues, the police engaged in the functional equivalent of interrogation when he made his initial incriminating statement, or whether, as the Government contends, Mr. Argraves' statement was voluntary and spontaneous.

For the reasons stated below, the Court concludes that Mr. Argraves' initial statement to police was voluntary and spontaneous, and as a consequence, the Court DENIES his motion to suppress that statement.  Given the Government's representation regarding Mr. Argrave's other

statements, the Court DENIES the remainder of the suppression motion as moot.

**I.**

On May 20, 2009, Mr. Argraves was indicted on one count of a 23 count Indictment filed against 33 individuals on the basis of their alleged involvement in federal narcotics trafficking violations. *See* Indictment [doc. # 1].  In particular, Mr. Argraves was charged with conspiracy with intent to distribute, and to distribute, five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(ii).  The Government took down its investigation on May 27, and at that time arrested numerous individuals who had been indicted.

On February 17, 2010, the Court held an evidentiary hearing on Mr. Argraves' motion to suppress.  At that hearing, the Court heard testimony from Detective Christopher Morris of the Wethersfield police department, who was assigned to the Drug Enforcement Administration (DEA) task force responsible for this investigation, and Officer Jennie Keyes, also of the Wethersfield police department.  Detective Morris has worked for the Wethersfield police department for over 11 years, and at the time of Mr. Argraves' arrest, he had worked in narcotics investigations for approximately two years.  Officer Keyes has been in the Wethersfield police department for nine years and had been a narcotics canine officer since 2005.

Detective Morris was in charge of assembling the team that was to arrest Mr. Argraves and search his house.  The arrest and search warrants stated that they could not be served until 6:00 am. Detective Morris and Officer Keyes testified that the other officers assembled early on May 27 at the Expo Center in Downtown Hartford to be briefed on the numerous arrests that would be made that day.  Thereafter, Detective Morris and eight other officers – including Officer Keyes – assembled at a firehouse parking lot quite close to Mr. Argraves' house.  Three of the officers, including Officer

Keyes, were in uniform.  The other officers were in plains clothes but had badges around their necks and also wore bullet-proof vests.  Each of the officers were armed.

Police decided that Officer Keyes would go to the front door of Mr. Argraves' house and use a ruse to get the occupants – and in particular, Mr. Argraves – out of the house so that the police did not need to break down the front door.  Officer Keyes rang the doorbell and told Ms. Cruz, Mr. Argraves' fiancee, that her car had been broken into in the driveway, and asked that she and Mr. Argraves exit the house.  Ms. Cruz went to speak with Mr. Argraves, but he declined to come out of the house.  Ms. Cruz did exit the house, at which time Officer Keyes told her that the real purpose of the call was that police intended to arrest Mr. Argraves and search the house.

While Ms. Cruz remained outside the house with Officer Keyes, the eight other police entered through the open door.  Approximately five policemen went into Mr. Argraves' bedroom, where he was lying in bed.  Police had their weapons drawn and they yelled that he was under arrest and to keep his hands in view.  Police then pulled Mr. Argraves from his bed, handcuffed him, and brought him down to the living room.  While in the bedroom, Mr. Argraves did not say anything to police.  Detective Morris testified that it only took a minute or so to get Mr. Argraves handcuffed and brought down to the living room.  Mr. Argraves was placed in a chair in the presence of Detective Morris and Lieutenant Dillon, while the other officers fanned out throughout the house. Eventually, Ms. Cruz and her two children were placed in a back family room, and Officer Keyes and her narcotics canine were brought into the house.

At this point, Mr. Argraves had not been read his *Miranda* rights, but there is no question that he was under arrest.  Detective Morris explained to Mr. Argraves that he was under arrest pursuant to a federal arrest warrant and that the police were going to search the entire house, with a narcotics

canine, in accordance with a federal search warrant.  Neither Detective Morris nor Lieutenant Dillon asked Mr. Argraves any questions, yelled at him, or threatened him in any way.  According to Detective Morris, he simply informed Mr. Argraves what would be happening in his house.  At that time, Detective Morris described Mr. Argraves as hunched over and looking down.  Mr. Argaves then said to the officers: "You are going to find a little in the basement."  That is only statement the Government seeks to introduce at trial.

Detective Morris, who was familiar with the Argraves investigation and believed him to be a large-scale drug dealer, asked Mr. Argraves, "how much is a little," to which Mr. Argraves responded "about 90 grams."  According to Detective Morris, he was simply trying to clarify what Mr. Argraves was saying.  Detective Morris also asked Mr. Argraves whether the drugs were powder cocaine or crack, to which Mr. Argraves responded "powder."  In response to another question by Detective Morris, Mr. Argraves also stated that the drugs were in a cardboard box in the basement with cleaning products.  At that point the questioning of Mr. Argraves stopped and police went about the search with the narcotics canine.  The Government does not seek to introduce any of the follow-up colloquy between Detective Morris and Mr. Argraves.

It took approximately three hours to conduct the search of each room of the house with the narcotics canine.  Police started the search in the basement, which leads to a garage, and the narcotics canine alerted on a cardboard box that was located just inside the basement door leading to the garage.  The dog was already focused on the box when an officer mentioned to Officer Keyes that drugs might be found in a cardboard box.  No officer pointed the canine to the box, and Officer Keyes had not been present when Mr. Argraves made his statement to Detective Morris.  Police found powder cocaine and a scale inside a cleaning mitt in the box.  Later, police also found a large

amount of cash (approximately $150,000) hidden in the kitchen and an envelope that the Government believes is a drug ledger. As previously mentioned, Mr. Argraves does not seek to suppress any of this physical evidence.

Once the search had been completed, Detective Morris sat Mr. Argraves down in the kitchen and read him his *Miranda* rights off a card. Mr. Argraves initialed each right after being informed of them. Detective Morris then told Mr. Argraves what police had found in the house and asked if he wanted to discuss the case. Mr. Argraves said he wanted a lawyer and refused to waive his *Miranda* rights. While Detective Morris was not with Mr. Argraves during the entire three-hour search, he is not aware of any other statement made by Mr. Argraves during the course of the search.

## II.

There is no dispute about the law that applies to this case. A suspect has *Miranda* rights where he is subject to "custodial interrogation," which the Supreme Court has defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. There is no question that Mr. Argraves was in custody at the time he made the incriminating statement. Thus, the resolution of the pending motion turns on whether Mr. Argraves was "interrogated" in violation of his *Miranda* rights, or whether his statement was spontaneous and voluntary such that his *Miranda* rights were not implicated.

Not "all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980). "'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id*. at 300. However, interrogation is not limited

5

to the explicit questioning of a suspect in custody.  Interrogation also includes words or actions on

the part of police that they should know are reasonably likely to elicit an incriminating statement.

> [T]he *Miranda* safeguards come into play whenever a person in custody is subjected
> to either express questioning or its functional equivalent.  That is to say, the term
> "interrogation" under *Miranda* refers not only to express questioning, but also to any
> words or actions on the part of the police (other than those normally attendant to
> arrest and custody) that the police should know are reasonably likely to elicit an
> incriminating response from the suspect.  The latter portion of this definition focuses
> primarily upon the perceptions of the suspect, rather than the intent of the police.
> This focus reflects the fact that the *Miranda* safeguards were designed to vest a
> suspect in custody with an added measure of protection against coercive police
> practices, without regard to objective proof of the underlying intent of the police.  A
> practice that the police should know is reasonably likely to evoke an incriminating
> response from a suspect thus amounts to interrogation.

*Id*. at 300-01; *see also Acosta v. Artuz*, 575 F.3d 177, 189 (2d Cir. 2009).

However, police are not "accountable for the unforeseeable results of their words or actions,"

and therefore "the definition of interrogation can extend only to words or actions on the part of police

officers that they should have known were reasonably likely to elicit an incriminating response."

*Innis*, 446 U.S. at 302.   Thus, voluntary or spontaneous statements made by a suspect in

circumstances where police should not have known their words or actions were reasonably likely to

elicit incriminating statements are not subject to *Miranda*, and therefore will not be suppressed.  *See,*

*e.g.*, *United States v. Rommy*, 506 F.3d 108, 132 (2d Cir. 2007); *United States v. Gelzer*, 50 F.3d

1133, 1138 (2d Cir. 1995).  This rule is consistent with "the purpose behind *Miranda* of curtailing

illegal custodial interrogations by law enforcement authorities." *United States v. Vigo*, 487 F.2d 295,

299 (2d Cir. 1973).

> The fundamental import of the privilege against self-incrimination while an
> individual is in custody is not whether he is allowed to talk to the police without the
> benefit of warnings and counsel, but whether he can be interrogated.  There is no
> requirement that police stop a person who enters a police station and states that he

wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make.  Volunteered statements of any kind are not barred by the Fifth Amendment . . . .

*Id*. (internal quotation marks omitted).

### III.

Applying these principles to the facts of this case, the Court concludes that Mr. Argraves was not subject to custodial interrogation or its functional equivalent.  Mr. Argraves argues that the initial show of force by the officers and Detective Morris's explanation of the circumstances of the search of his house were intended to get Mr. Argraves to talk.  For a variety of reasons, the Court cannot agree with this assertion.

First, Detective Morris testified that he briefly explained the situation to Mr. Argraves not as an interrogation technique, but because it is standard practice to tell a suspect what is going to happen in his home.  The Court would add that this practice is also a matter of common courtesy.

Second, Detective Morris had no expectation that his explanation of what the police would be doing in Mr. Argraves' house would elicit an incriminating admission from Mr. Argraves, nor does the Court believe that Detective Morris *should* have had such an expectation.  *See United States v. Figueroa*, 300 Fed. Appx. 93, 95 (2d Cir. 2008) (summary order) ("[W]e conclude that none of the three statements at issue on appeal was made in response to express questioning or its functional equivalent.  All three statements were made while the officers were going about their routine tasks in conducting a search, securing a crime scene, and making an arrest. The district court did not find, nor does the record suggest, that the officers made any statements or took any actions that they should have known were reasonably likely to elicit an incriminating response.").  The officers did not ask Mr. Argraves any questions and had no information about Mr. Argraves to suggest that he

was likely to confess in the face of his arrest and a search of his house.

Third, it is also noteworthy that Mr. Argraves did not make the incriminating statement until he was seated in a room with only two officers who were explaining that he was under arrest and that his house was being searched.  The Court credits the testimony of Detective Morris that the officers did not yell at Mr. Argraves or threaten him in any way.  If Mr. Argraves' admission was the product of compulsion, it seems more likely that it would have occurred during the initial show of force in his bedroom, not during the relative calm that followed in the living room.  *See Isasi v. Herbert*, 176 Fed. Appx. 143, 144 (2d Cir. 2006 ) (summary order) (rejecting a claim of interrogation when the suspect was "handcuffed, in custody, and surrounded by law enforcement personnel").  Moreover, Mr. Argraves did not make any additional statements after the discussion with Detective Morris, and never voluntarily revealed the location of the cash that was hidden in his house.  Again, this suggests that Mr. Argraves' initial statement was voluntary and spontaneous, rather than compelled through interrogation.  If Mr. Argraves had felt compelled to talk by the allegedly coercive circumstances of his arrest, one might have expected him to say more than he did.[1]

Finally, the Court is also reluctant to set a precedent that a simple show of force by police officers during an arrest that is followed by a search of a suspect's house amounts to an interrogation for *Miranda* purposes.  The execution of an arrest and search warrant often involves a show of force, and to accept Mr. Argraves' argument would be to require law enforcement officers immediately to read a suspect his *Miranda* rights whenever they enter a residence to arrest a suspect and search his residence.  *See Gelzer*, 50 F.3d at 1138 (suspect made incriminating statements while being

---

[1] The Court notes that even if Mr. Argraves had felt compelled to talk, this would only have amounted to a custodial interrogation if the officers knew or should have known that their actions were likely to elicit an incriminating response.  *See Innis*, 446 U.S. at 302.

8

transported to the police station following his arrest); *Vigo*, 487 F.3d at 299 ("The statements were made immediately after Vigo's arrest, at the scene of the arrest and before any systematic inquiry was begun by the arresting officers.").   According to Detective Morris, the officers followed standard procedure in this case, and thus there is nothing to distinguish this search from thousands of others like it.   The Court notes that "courts have generally rejected claims . . . that disclosure of the results of a lineup or other inculpatory evidence possessed by the police, without more, constitutes 'interrogation' under *Innis*."   *Acosta*, 575 F.3d at 191 ("[C]ourts have not endorsed the proposition that statements by law enforcement officials to a suspect regarding the nature of the evidence against the suspect constitute interrogation as a matter of law.") (internal quotation marks and citation omitted).   Explaining to a suspect that the police are already in possession of inculpatory evidence seems more likely to elicit an incriminating response than the initiation of a search to find such evidence, as occurred here.

It might have been advisable for the officers to have read Mr. Argraves his *Miranda* rights as soon as they placed him under arrest.   However, they were not required to do so until they intended to interrogate him.   The Court concludes that no interrogation had begun at the time that Mr. Argraves made his initial statement to police. Detective Morris did not intend to elicit an incriminating response, nor should he have reasonably expected such a response, at that time. Rather, Mr. Argraves' admission was spontaneous and voluntary, and his *Miranda* rights were not violated.   Therefore, his Motion to Suppress Statements to Law Enforcement Personnel [doc. # 501] is DENIED.

IT IS SO ORDERED.


/s/ _____Mark R. Kravitz_____
United States District Judge


Dated at New Haven, Connecticut: **February 19, 2010.**